IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KATIE STARKS,<br><br>    Plaintiff,<br><br>vs.<br><br>TULA LIFE, INC.,<br><br>    Defendant. | 8:23-CV-4<br><br>MEMORANDUM AND ORDER ON MOTION TO DISMISS |

## I. INTRODUCTION

Katie Starks has sued TULA Life, Inc., (TULA) for defamation, breach of contract, tortious interference with a business relationship, false light invasion of privacy, and intentional infliction of emotional distress. Filing 1. This matter is before the Court on TULA's Motion to Dismiss. Filing 6. For the reasons stated herein, the Court grants TULA's Motion.[1]

## II. BACKGROUND

Katie Starks, an Omaha resident, is a health, beauty, and lifestyle blogger who promoted beauty products on her website and Instagram profile. Filing 1 at 1, 3. Prior to January of 2022, Starks promoted skincare products from TULA, a New York skincare company, pursuant to an influencer agreement with TULA. Filing 1 at 8; Filing 6-1.[2] The influencer agreement gave TULA

---

[1] Tula's request for oral argument is denied as the Court does not hold oral arguments on straightforward motions to dismiss. *Cf.* NECivR 56.1 ("Generally, the Court does not hear oral argument on summary judgment motions.").

[2] The influencer agreement between Starks and TULA—which TULA included in its Motion to Dismiss—is not attached to Starks's Complaint. Nevertheless, the Court can consider it without converting TULA's Motion into a motion for summary judgment because Starks alleges its existence, references it as the basis of her breach-of-contract claim, and does not question the authenticity of the agreement attached to TULA's Motion. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss." (quoting *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003))); *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (explaining that a court can consider documents "necessarily embraced by the pleadings, includ[ing] documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading"); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (observing the common practice of plaintiffs neglecting to attach contracts to complaints when it would "undermine the legitimacy" of a claim).

the broad right to immediately terminate the agreement if Starks became "involved in or the subject of adverse publicity" or if Starks "engage[d] in conduct that would" (1) "disparage, denigrate, [or] portray in an unfavorable light [Starks or TULA]," (2) bring Starks, TULA, or TULA's products "into public disrepute, contempt or scandal," or (3) "injure the success of [TULA or TULA's products]." Filing 6-1 at 7.

During the COVID-19 pandemic in 2021, Starks took to social media to express her disagreement with Omaha's mask mandate policy for schools. Filing 1 at 3–6. According to the Complaint, on one of Stark's videos criticizing mask mandates, people left comments comparing wearing masks to the Holocaust. Filing 1 at 7, 28. Starks alleges that she has never made such a comparison or implied that she held this view. Filing 1 at 7.

Shortly after posting the video on her Facebook profile, in mid-January of 2022, companies began contacting Starks and severing ties with her. Filing 1 at 7. On January 14, 2022, a TULA representative contacted Starks by email to terminate the influencer agreement with her. Filing 1 at 8, 33. The representative explained that Starks had "engaged in conduct that would disparage, denigrate, or portray an unfavorable light on the TULA brand across [Starks's] Instagram page and Facebook page." Filing 1 at 33. The Complaint suggests that TULA allegedly terminated the influencer agreement by misattributing the comments comparing mask mandates with the Holocaust to Starks. Filing 1 at 9, 13.

Starks alleges that, when customers began contacting TULA to express disappointment with TULA ending its relationship with Starks, TULA would respond with the following message:

> At TULA, we have zero tolerance for racism or hate within our community & regularly reevaluate our brand partnerships to ensure all our partners are aligned with our values. We have publicly committed ourselves as an ally to underrepresented communities & take this commitment seriously.

2

> As a brand, we do not "talk politics" on our social media or anywhere else, and we would not part ways with a partner solely due to their political stance out of respect for a range of political beliefs. However, when it comes to human rights, TULA is actively anti-racist & confidently speaks out against injustice.

Filing 1 at 8, 40. On January 29, 2022, TULA posted a similar statement on its Instagram page:

> As a brand, we would not part ways with a partner solely due to their political stance, out of respect for a range of political beliefs. However, when it comes to human rights, TULA is actively anti-racist & confidently speaks out against injustice.
>
> We, as a team and a brand, have zero tolerance for racism or hate within our community. We have publicly committed ourselves as an ally to underrepresented communities & take this commitment seriously.

Filing 1 at 9, 38. Starks characterizes these messages as labeling her "a racist" and implying that she made "hateful and racist remarks." Filing 1 at 10, 12. According to Starks, because of TULA's statements, she has suffered emotional harm and a loss of income. Filing 1 at 12.

On January 5, 2023, Starks sued TULA in this Court. Filing 1. In her Complaint, Starks brings claims for defamation, breach of contract, tortious interference with a business relationship, false light invasion of privacy, and intentional infliction of emotional distress. Filing 1 at 12–17. TULA filed its Motion to Dismiss on March 29, 2023. Filing 6.

### III. ANALYSIS

#### A. Applicable Standards

TULA moves under Federal Rule of Civil Procedure 12(b)(6). When faced with a motion to dismiss under Rule 12(b)(6), a court evaluates whether the complaint contains "sufficient factual matter to 'state a claim to relief that is plausible on its face.'" *Edwards v. City of Florissant, Missouri*, 58 F.4th 372, 376 (8th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plausibility means that the plaintiff pleads facts that allow the court "'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Christopherson v. Bushner*, 33

3

F.4th 495, 499 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). Threadbare recitals of elements, conclusory statements, and "factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted). When a complaint "pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Christopherson*, 33 F.4th at 499. In ruling on a Rule 12(b)(6) motion, a court must "accept 'the facts alleged in the complaint as true and draw[] all reasonable inferences in favor of the nonmovant.'" *Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)).

### B. Defamation

Starks predicates her defamation claim on the two statements TULA made after terminating the influencer agreement with her. Filing 1 at 12–13. According to Starks, TULA's statements "referred to [her] as a racist" and implied that "Starks made hateful and racist remarks." Filing 1 at 12–13. TULA counters that the statements are not actionable because whether someone is "racist" or "hateful" is not a provably false statement of fact. Filing 6 at 9. TULA also points out that the two statements on which Starks bases her claim do not expressly refer to Starks at all. Filing 6 at 11–12.

Both parties state that Nebraska law governs Starks's claims, and the Court agrees. *See Netherlands Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) (assuming that Minnesota law applied when neither party disputed that it did); *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008) ("Both parties rely on Missouri law, and consequently we assume that Missouri law controls.").

Stated in general terms, defamation of a nonpublic figure[3] occurs when the defendant negligently makes a false statement about the plaintiff to a third party that harms the plaintiff's reputation. See *JB & Assocs., Inc. v. Nebraska Cancer Coal.*, 932 N.W.2d 71, 78 (Neb. 2019) (listing the elements for defamation). Under Nebraska law, a court must first determine as a matter of law "whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion." *Choice Homes, LLC v. Donner*, 976 N.W.2d 187, 203 (Neb. 2022). If not, the First Amendment bars liability. See *K Corp. v. Stewart*, 526 N.W.2d 429, 435 (Neb. 1995) ("[S]tatements which cannot be interpreted as stating actual facts are entitled to First Amendment protection."). In other words, "[O]bjective expressions of verifiable facts" are actionable, while "subjective impressions" are not. See *Choice Homes*, 976 N.W.2d at 203 (internal quotation marks omitted).

The line between an actionable factual assertion and a protected opinion can be elusive. Thus, the Nebraska Supreme Court adheres to a "totality of the circumstances" test to determine if a statement is actionable, with a particular emphasis on the context in which the defendant makes the statement and the language used. *Steinhausen v. HomeServices of Nebraska, Inc.*, 857 N.W.2d 816, 828 (Neb. 2015). "Relevant factors include (1) whether the general tenor of the entire work negates the impression that the defendant asserted an objective fact, (2) whether the defendant used figurative or hyperbolic language, and (3) whether the statement is susceptible of being proved true or false." *Choice Homes*, 976 N.W.2d at 203–04. "[T]he knowledge, understanding, and reasonable expectations of the audience to whom the communication was directed," along with "the broader setting in which the statement appears," are also appropriate considerations. *Id.* at 204.

---

[3] The Court assumes without deciding that Starks is a nonpublic figure, because it has no bearing on the Court's analysis of whether the statements are actionable.

In her Complaint, Starks alleges that TULA's statements defamed her because they "referred to [her] as a racist" and implied that "Starks made hateful and racist remarks." Filing 1 at 12–13. The Court will assume without deciding that a reasonable reader could conclude TULA's statements imply that Starks is a racist and that she made hateful and racist remarks. Whether these statements imply a "provably false factual assertion" about Starks is dispositive of her claim. *See Choice Homes*, 976 N.W.2d at 203. How the Nebraska Supreme Court approaches this issue serves as a useful guide.

In *K Corporation v. Stewart*, the Nebraska Supreme Court examined whether a letter the defendant wrote about the conditions at the plaintiff's recreational facility contained actionable defamatory statements. *See K Corp.*, 526 N.W.2d at 432–33. The letter outlined the "physical deterioration of the club," the "poor condition of the outdoor tennis courts," and the "poor sanitary conditions" of the locker and exercise rooms. *Id.* at 432–33. The Court emphasized that the letter did not "objectively define what constitutes an unacceptable level of deterioration, what constitutes acceptable quality, or what distinguishes first class condition from any other kind of condition . . . ." *Id.* at 435. By contrast, the part of the letter alleging that the defendant was "particularly disturbed by the notice from the Omaha Board of Health concerning the pool and hot tub" was actionable because it could "only be understood to mean that the pool and hot tub were found by the board to have been unclean." *Id.* at 435. In other words, when the letter did not provide an explanation about why the facility did not meet a certain standard or quality it was simply relaying the defendant's subjective impressions, but when the letter referred to a notice about the cleanliness of the pool and hot tub it asserted a verifiable fact about the plaintiff's facility.

The lack of an objective measure was also dispositive in *Wheeler v. Nebraska State Bar Association*. In *Wheeler*, a county court judge sued the state bar association after it released the

6

results from a survey of lawyers giving numerical ratings for the judge's knowledge of the law, absence of bias, judicial temperament, docket management, order writing, and health. *See Wheeler, 508 N.W.2d at 919*–20. The judge argued that each rating could be compared to an objective metric to determine its truthfulness; for example, management of the docket could be verified through court records and knowledge of the law could be determined from law school transcripts. *See id. at 923*. The Nebraska Supreme Court rejected this argument, finding that the survey results were "a compilation of attorneys' subjective ratings on each characteristic." *Id.* at 923. The Court held that "[t]here [was] simply no objective method to determine the rating an individual judge should receive in any given performance category; therefore, by their very subjective nature, ratings cannot imply a provably false factual assertion." *Id.* at 924.

Accordingly, under Nebraska caselaw, the lack of an objective measure to verify the truth or falsity of a statement often takes that statement out of the realm of actionable defamation. In this case, Starks alleges, and the Court assumes, that the statements imply that Starks is a racist and made hateful and racist remarks. These assertions are not actionable because an ordinary reader would not conclude that these statements implied a factual assertion about Starks capable of being proven true or false. *See Choice Homes*, 976 N.W.2d at 204. Neither TULA's statements nor the context in which they appear provide any objective metric to determine when someone is a racist or makes comments that are "hateful" or "racist." Instead, the statements simply state that TULA has "zero tolerance for racism or hate within [TULA's] community." Filing 1 at 8–9, 38, 40. Without any metric by which behavior can be measured as "racist" or "hateful," it is not possible to verify the statements' truthfulness.

In other words, calling an individual a "racist" or characterizing a person's statements as being "racist" or "hateful," standing along, is not "capable of proof or disproof." *Wheeler*, 508

7

N.W.2d at 922. Such accusations, in a vacuum, cannot be judged by reference to an objective metric, and TULA's statements and their broader context furnish none. Many courts have concluded that similar statements, without more, are not actionable. *See, e.g., L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1131 (7th Cir. 2022) (holding that "hypocrite," "chauvinist," and "racist" were not actionable); *Doe #1 v. Syracuse Univ.*, 468 F. Supp. 3d 489, 512 (N.D.N.Y. 2020) ("Courts in New York have consistently held that terms like 'racist' constitute nonactionable opinion."); *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) ("In daily life 'racist' is hurled about so indiscriminately that it is no more than a verbal slap in the face . . . . It is not actionable unless it implies the existence of undisclosed, defamatory facts . . . ."); *Smith v. Sch. Dist. of Philadelphia*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (concluding that allegations that the defendant called the plaintiff a "racist and anti-Semitic" were "expressions of opinions"); *Williams v. Lazer*, 495 P.3d 93, 96 (Nev. 2021) (holding that allegations that the plaintiff "displayed unethical, unprofessional, racist and sexist behavior" was not actionable). Instead, at most, TULA's statements convey TULA's "subjective impressions" of Starks. *Choice Homes*, 976 N.W.2d at 203.

Although not entirely clear, Starks appears to also be alleging that the statements accuse her of comparing mask mandates to the Holocaust. Filing 1 at 13. To the contrary, a reasonable reader would not conclude that TULA's statements imply she made such a comparison. For one, construing the statements "in their ordinary sense," *K Corp.*, 526 N.W.2d at 435, they do not hint at specific conduct committed by Starks. In fact, the statements are primarily about TULA and its policies. The statements lack the requisite specificity that would ordinarily accompany a statement accusing a person of committing a precise act. *See K Corp.*, 526 N.W.2d at 435 (outlining that "the specificity of the statement" is relevant to whether a statement is a verifiable factual assertion or a

8

subjective impression). The Complaint also does not plausibly allege that the context in which these statements appeared would cause an ordinary reader to conclude TULA was asserting Starks compared mask mandates to the Holocaust. *See Choice Homes*, 976 N.W.2d at 203 ("[L]anguage must be evaluated in its broader context to assess whether a reader would have understood the allegation to be a statement of fact."). For example, there are no allegations that TULA's customers were aware that TULA discontinued its partnership with Starks under a mistaken belief that she compared mask mandates to the Holocaust, such that an ordinary reader would find that TULA's statements were making an implicit accusation to that effect.[4]

Finally, Starks argues that TULA's statements are actionable because they imply that she is not an "ally to underrepresented communities" and that she is "unfit to perform her job responsibilities." Filing 12 at 12. This argument is unavailing for two reasons. First, Starks never alleged that TULA's statements implied she was not an "ally to underrepresented communities" and that she is "unfit to perform her job responsibilities" in her Complaint. Instead, these claims appeared for the first time in her brief in opposition to TULA's Motion to Dismiss. Filing 12 at 12. A plaintiff cannot attempt to salvage claims by raising allegations in a brief opposing a motion to dismiss that are nowhere to be found in a complaint. *See Al-Saadoon v. Barr*, 973 F.3d 794, 805 (8th Cir. 2020) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (alteration in original) (quoting *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989))). Not only do such tactics prevent the Court from addressing claims in the ordinary briefing process, amending a complaint by a brief in opposition is not permitted by law. *See id.*

---

[4] The Court notes that the messages from TULA's customers to TULA in support of Starks do not assert a particular reason that the customers believed caused TULA to terminate its relationship with Starks beyond vague references to "cancel culture," "freedom of speech," and Starks's "freedom to choose what [she] wants for [her] family." Filing 1 at 40; Filing 12-4 at 2; Filing 12-6 at 2–3.

Second, even assuming that her Complaint did include these allegations, these contentions move her defamation claim no closer to actionability because TULA's statements say none of those things. Instead, the statements explained that TULA ceased its partnership with Starks because it had "zero tolerance for racism or hate." Starks cannot defeat TULA's Motion by contorting the statements to have meanings that an ordinary reader would not ascribe to them. *See id.* at 204–05 (rejecting the plaintiff's argument that the defendant's review implied that the plaintiff would "unfairly sue" anyone who signed an agreement with it because the review did not say the defendant was unfairly sued and did not imply that the readers of the review would also be sued); *Moats v. Republican Party of Nebraska*, 796 N.W.2d 584, 594 (Neb. 2011) (rejecting the plaintiff's argument that a campaign publication accused him of falsifying an affidavit because the publications only accused the plaintiff of making misleading statements in an affidavit); *see also K Corp.*, 526 N.W.2d at 435 (construing the allegedly defamatory statements "in their ordinary sense").

TULA's two statements are not susceptible to verification as true or false. Rather, they merely express TULA's "subjective impressions" of Starks. Accordingly, the First Amendment bars Starks's defamation claim.

### C. False Light Invasion of Privacy

In her claim for false light invasion of privacy, Starks alleges that TULA "placed [her] in a false light when they accused her publicly of being a racist." Filing 1 at 15. The only statements forming the basis for this claim are the statements underlying Starks's defamation claim. Under Nebraska law, "[I]f a plaintiff asserts claims of both libel and false light invasion of privacy based on the same statement, the false light claim is subsumed within the defamation claim and is not separately actionable." *Steinhausen*, 857 N.W.2d at 830; *see also Moats*, 796 N.W.2d at 598 ("[A]

statement alleged to be both defamatory and a false light invasion of privacy is subsumed within the defamation claim and is not separately actionable."). Therefore, Starks's false light claim must be dismissed. *See Moats*, 796 N.W.2d at 598 ("Because each allegedly defamatory publication failed to state a claim for relief under defamation, they likewise fail to state a claim for relief for false light invasion of privacy.").

### D. Intentional Infliction of Emotional Distress

In her claim for intentional infliction of emotional distress, Starks claims that TULA "acted intentionally and recklessly when [it] publicly labeled [Starks] a racist due to political pressure and refused to take down or retract the post after they knew it was false." Filing 1 at 16. Starks alleges that TULA "publicly ridiculed and embarrassed [Starks] when [TULA] shared to millions of people that [it] terminated [its] employment relationship with her because [TULA does] not tolerate racism and hate speech." Filing 1 at 16. TULA argues that Starks fails to plausibly allege that TULA's conduct was sufficiently "extreme or outrageous" to provide a basis for an intentional infliction of emotional distress claim. Filing 6 at 16–19. The Court agrees.

"A plaintiff bringing a claim of intentional infliction of emotional distress under Nebraska law must clear 'a high hurdle.'" *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (quoting *Heitzman v. Thompson*, 705 N.W.2d 426, 431 (Neb. 2005)). To state a claim, the plaintiff must plausibly allege:

> (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it.

*Roth v. Wiese*, 716 N.W.2d 419, 431 (Neb. 2006); *see also KD v. Douglas Cnty. Sch. Dist. No. 001*, 1 F.4th 591, 600 (8th Cir. 2021) (citing *Roth* for the elements of an intentional infliction of

11

emotional distress claim). TULA challenges the second element: that the conduct must be outrageous and extreme. It is up to a court to first decide whether a defendant's conduct may be outrageous and extreme enough to be actionable. *See Brandon ex rel. Est. of Brandon v. Cnty. of Richardson*, 624 N.W.2d 604, 621 (Neb. 2001) ("[I]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery or whether it is necessarily so."). "Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case." *Roth*, 716 N.W.2d at 432. "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities that result from living in society do not rise to the level of extreme and outrageous conduct." *Heitzman*, 705 N.W.2d at 431.

Starks's allegations fail to satisfy this demanding standard. Assuming that TULA's statements can be fairly characterized as "publicly label[ing] [Starks] a racist," such conduct does not rise to the level necessary to state a plausible claim for intentional infliction of emotional distress. This language cannot be considered "beyond all bounds of decency" or "atrocious and utterly intolerable in a civilized community." *KD*, 1 F.4th at 600. TULA's alleged actions rise no further than the "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that the Nebraska Supreme Court has found to be insufficient. *Heitzman*, 705 N.W.2d at 431. Other Nebraska Supreme Court cases supports this conclusion. *See Foreman v. AS Mid-Am., Inc.*, 586 N.W.2d 290, 296–97, 306 (Neb. 1998) (holding that a "campaign" of "verbal, physical, and psychological" harassment and intimidation perpetrated by union members against nonunion members was not "so outrageous and extreme"); *Davis v. Texaco, Inc.*, 313 N.W.2d 221, 222–23 (Neb. 1981) (holding that the plaintiff, who suffered burns from splashing radiator fluid and had to remove shirt and part of her undergarments, did not experience outrageous conduct

12

from the defendant who gave the plaintiff a dirty fender cover after she made three requests for a towel, disabled her vehicle until she gave back the cover, and then provided an old Texaco shirt after allowing her to leave). Starks fails to plausibly plead that TULA's actions were "so outrageous in character and so extreme in degree" to support a claim for intentional infliction of emotional distress.

### E. Tortious Interference with a Business Relationship

In her claim for tortious interference with a business relationship, Starks alleges that there was "[a] valid business relationship or expectancy . . . between [TULA] and [Starks]" to post content for TULA on her social media. Filing 1 at 14. Starks claims that TULA "intentionally interfered with [Starks's] business relationship when they insisted on ending the relationship based on her political views." Filing 1 at 14. However, "a party cannot interfere with its own contract." *Huff v. Swartz*, 606 N.W.2d 461, 467 (Neb. 2000) (quoting *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991)); *see also Dominium Illinois Three v. Arbor Dev. Grp., Inc.*, No. A-00-1051, 2002 WL 31056744, at *10 (Neb. Ct. App. Sept. 17, 2002) (characterizing an argument that the one of the parties to a contract interfered with that contract as "not legally possible"). "The premise of a cause of action for tortious interference is that the defendant intentionally disrupted a commercial relationship between the plaintiff and a *third party*." *Bucktail I Ranch v. Farm Credit Bank of Omaha*, No. A-91-286, 1993 WL 70942, at *3 (Neb. Ct. App. Mar. 16, 1993) (emphasis in original). Starks grounds the entirety of her tortious interference claim on the contract she had with TULA. Filing 1 at 14. Therefore, under Nebraska law, it must be dismissed.

13

### F. Breach of Contract

Finally, the Court addresses Starks's breach-of-contract claim. Starks alleges that TULA breached the influencer agreement it had with her when it terminated the contract prior to the contract term expiring. Filing 1 at 14. According to Starks, her "right to free speech under the First Amendment" did not give TULA the power to terminate the influencer agreement early. Filing 1 at 14. TULA responds that the First Amendment is irrelevant to Starks's breach-of-contract action because it is not a state actor. Filing 6 at 21. TULA also contends that it "was well within its rights to terminate the [influence agreement]" based on the plain terms of the contract. Filing 16 at 12–13.

Starks promoted TULA's products pursuant to an influencer agreement. Filing 1 at 8; Filing 6-1. The influencer agreement had a term from January 15, 2021, to January 31, 2022. Filing 6-1 at 2 (providing a due date for sixth piece of content on or before January 31, 2022). TULA terminated the influence agreement on January 14, 2022. Filing 1 at 8.

The influencer agreement gave TULA a broad right to immediately terminate the agreement if Starks became "involved in or the subject of adverse publicity" or if Starks "engage[d] in conduct that would" (1) "disparage, denigrate, [or] portray in an unfavorable light [Starks or TULA]," (2) bring Starks, TULA, or TULA's products "into public disrepute, contempt or scandal," or (3) "injure the success of [TULA or TULA's products]." Filing 6-1 at 7.

"A breach of contract action consists of a promise, its breach, damages, and compliance with any conditions precedent." *Ryan v. Streck, Inc.*, 958 N.W.2d 703, 710–11 (Neb. 2021). A court interprets the terms of a contract as a matter of law. *See Bierman v. Benjamin*, 943 N.W.2d 269, 273 (Neb. 2020). If a contract is ambiguous, meaning that "a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or

14

meanings," then the contract's construction becomes a question of fact that permits "the consideration of extrinsic evidence" to fix its meaning. *Id.* at 274. "When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them." *Id.*

The Court agrees with TULA that, under the facts alleged in the Complaint, the plain terms of the influencer agreement gave it the right to terminate the contract. If Starks became "involved in or the subject of adverse publicity" or acted in a way that "would injure the success of [TULA or TULA's products]," TULA could terminate the influencer agreement without further notice. As alleged in the Complaint, that occurred. Starks injected herself in a public debate about COVID-19 policies and school mask mandates. Filing 1 at 3–4. She protested Omaha's policies and allowed her children to be suspended from school as part of her protest. Filing 1 at 5. On social media, Starks encouraged others "to stand up to mask mandates and to stop financially supporting business[es] that would not take such a stand." Filing 1 at 6. Starks also advocated for parents not sending their kids to school if the school mask mandates remained in force. Filing 1 at 6. Additionally, Starks claimed that brands with which she had partnered "cancelled their partnerships with her due to her political stance *and outcry from individuals who disagreed with her*." Filing 1 at 8 (emphasis added). Given the allegations in the Complaint, Starks had become "involved in or the subject of adverse publicity" and acted in a way that "would injure the success" of the TULA brand. TULA had the right to terminate the influencer agreement under the contract's plain terms.

To the extent that Starks argues that TULA violated her rights under the First Amendment, the Court agrees with TULA that the First Amendment does not apply to TULA because it is a private entity. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926, 1928 (2019)

(explaining that the First Amendment "constrains governmental actors" and that a "private entity" can be a state actor only "in a few limited circumstances").

## IV. CONCLUSION

For these reasons, the Court concludes that Starks's Complaint fails to state a claim for relief. Accordingly,

IT IS ORDERED:

1. Defendant TULA Life's Motion to Dismiss, Filing 6, is granted;
2. Plaintiff Katie Starks's Complaint, Filing 1, is dismissed; and
3. This case is terminated.

Dated this 26th day of July, 2023.

BY THE COURT:

        Brian C. Buescher
        United States District Judge

16